UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x
JONATHAN P. WHARTON,

                    Plaintiff,

         -against-                          MEMORANDUM & ORDER
                                            10-CV-0265(JS)(AYS)
COUNTY OF NASSAU; NASSAU COUNTY
SHERIFF'S DEPARTMENT; ELIZABETH
LOCONSOLO, in her official and
individual capacity; CAPTAIN PETER
DUDEK, in his official capacity;
CAPTAIN ANTHONY ZUARRO, in his
official andindividual capacity;
GERARD HUMPHREYS, in his official
and individual capacity; and MARY
ELIZABETH OSTERMANN, in her
official and individual capacity,

                    Defendants.
------------------------------------x
APPEARANCES
For Plaintiff:      Frederick K. Brewington, Esq.
                    Law Offices of Frederick K. Brewington
                    556 Peninsula Boulevard
                    Hempstead, NY 11550

For Defendants:     Barbara E. Van Riper, Esq.
                    Office of the Nassau County Attorney
                    One West Street
                    Mineola, NY 11501

                    Deanna Darlene Panico, Esq.
                    Andrew Kenneth Preston, Esq.
                    Michael Paul Siravo, Esq.
                    Bee Ready Fishbein Hatter & Donovan, LLP
                    170 Old Country Road, Suite 200
                    Mineola, NY 11501

SEYBERT, District Judge:

         Plaintiff Jonathan P. Wharton ("Wharton") commenced this

action on January 15, 2010 against the County of Nassau (the

"County"), the Nassau County Sheriff's Department (the "Department"), Elizabeth Loconsolo ("Loconsolo"), Captain Peter Dudek ("Dudek"), Captain Anthony Zuarro ("Zuarro"), Gerard Humphreys ("Humphreys"), and Mary Elizabeth Ostermann ("Ostermann" and collectively, "Defendants") alleging that Defendants discriminated against him based upon his race and religion, and retaliated against him for complaining about Defendants' discriminatory employment practices. A six-day jury trial was held beginning on September 8, 2014. The jury found Defendants liable for retaliation and awarded Wharton $420,000 in damages. Pending before the Court is Defendants' motion for judgment as a matter of law or, in the alternative, for a new trial. (Docket Entry 127.) For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

<u>BACKGROUND</u>[1]

Wharton worked as a Corrections Officer at the Suffolk County Sheriff's Department for twenty-four years. (Trial Tr. 748:13-20.) He was hired in 1988 and initially assigned to the Department's Security Unit. (Sept. 10, 2013 Memorandum & Order (the "2013 Order"), Docket Entry 79, at 3.) Later, Wharton was reassigned to the department of Administration Public Information, where he gave tours and managed communications with the public.

---

[1] The following facts are drawn from the testimony given at trial, as well as the Court's prior orders.

(2013 Order at 3.)   In February 2002, he was reassigned to a security platoon within the correctional facility.  (2013 Order at 3.)  Although Wharton was a model employee, he was never promoted from Corrections Officer to the rank of Corporal because he did not pass a civil service exam that would have made him eligible for a promotion.  (Tr. 556:1-558:24, 748:21-749:11.)

Beginning in 1990, Wharton began volunteering his time to religious endeavors in the prison.[2]  He received training as a Chaplain from the Nassau County Sheriff's Department and provided religious advice in connection with an alcohol and drug program for inmates.  (Tr. 535:8-18.)  In 2000, the Sheriff sent Wharton for training and certification as a Senior Chaplain.  (2013 Order at 4.)

I.   The Notice of Personal Action

On May 11, 2009, Wharton attended services in the inmate chapel while he was off-duty.  (2013 Order at 4.)  According to Defendants, Wharton's attendance at the service in uniform while off-duty violated the Department's Policies and Procedures.  (2013 Order at 4-5.)  The Department's regulations required any off-duty officer who wanted to access an area of the prison to make that request "directly to the tour commander of the facility," (Tr.

_____

[2] One witness described Wharton as "one of the elders of the church" (Tr. 399:21-25.)  Wharton is also an ordained minister (Tr. 400:2-6.)

3

163:4-9), and required that an officer's uniform only be worn for "official business,"[3] and not for "personal matters," (Tr. 167:23-168:8).

When Wharton's commanding officer, Captain Zuarro, learned that Wharton attended an inmate service, he sent Wharton an email asking Wharton to write a report explaining his actions. (Tr. 125:5-20.) Wharton's report stated in pertinent part:

> My attendance at the May 11, 2009 religious service conducted at the facility and any other religious services that I have attended here while off duty at the facility, was in the capacity of an employee of the Nassau County Correctional Center and [as] a Christian.
>
> I was asked by the chaplain and pastor conducting the service to say a prayer and was honored to oblige as they were aware of my certification and licensing as a minister and chaplain, certified under the authority of this very facility.
>
> I was not aware that I was breaking any rules, policies or procedures, but only that I was exercising a religious freedom.

(Tr. 173:19-174:6.) Captain Zuarro interpreted Wharton's response to be an admission that he had remained "in the facility off duty more than once." (Tr. 174:12-14.)

---

[3] The regulations provided that "[a] member of the division of correction shall not visit any division area when off duty, except as part of his official business." (Tr. 168:24-169:1.)

On July 20, 2009, Zuarro called Wharton into his office and issued him a Notice of Personnel Action ("NOPA") which listed certain violations that Wharton purportedly committed, including the incident at the inmate chapel. (2013 Order at 5.) Wharton testified that he was merely asked to read and sign the NOPA and that Zuarro did not provide him with any further explanation. (Tr. 565:24-566:13.) Zuarro admitted that, before issuing the NOPA, he never asked anyone whether Wharton had any responsibilities in the jail other than his security duties. (Tr. 89:7-16.) Wharton refused to sign the document because he did not agree with its contents. (Tr. 715:18-21.)

The parties hotly disputed whether the NOPA was disciplinary in nature. Zuarro testified that the NOPA was not disciplinary because it was merely a "counseling" notice that did not result in a loss of job benefits. (Tr. 179:17-180:7.) Although the NOPA was in Wharton's personnel file, Zuarro testified that he could ask for it to be removed after eighteen months. (Tr. 191:6-13.) Zuarro nevertheless admitted that the issuance of the NOPA was the "first step in the disciplinary process," and he was unsure whether the document was considered in connection with an employee's evaluation. (Tr. 113:16-21, 121:25-122:10.) Wharton told the jury that before receiving the NOPA, he had never been reprimanded. (Tr. 609:20-23.)

## II. Requests for Religious Accommodations

Beginning in April 2010, Wharton submitted a number of written requests to take time off for religious reasons. He styled the applications: (1) requests for "emergency reassignments," (2) requests for "self-swap[s]," and (3) requests for religious accommodations. (2013 Order at 6-7.)

Corrections officers typically chose how they would use their vacation days at the beginning of the year. Priority was given to the officers with the most seniority. (Tr. 587:4-14.) In addition to vacation days, officers could also use personal days or "comp time" to take days off. According to Zuarro, if an officer wanted to take Christmas off, for example, he would submit a request for "vacation or [a] personal day or comp time."[4] (Tr. 160:4-8.)

In addition to vacation days, personal days, and comp time, officers could be permanently re-assigned from one tour of duty to another, or temporarily reassigned to a shift for an official purpose--for example to attend required training. (Tr. 929:6-14.) Two officers could also mutually agree to swap daily shifts with one another. (Tr. 881:12-19.) Finally, there was a mechanism to take time off called a "self-swap," which involved swapping tours with oneself. Wharton explained that a self-swap

---

[4] Wharton received 22 vacation days and 5 personal days in 2010, for a total of 27 days off. (Tr. 750:8-20.)

is "when you are swapping one day that you're supposed to work for a different day you're not supposed to work." (Tr. 763:8-764:6.) Wharton suggested that term "self-swap" could be used synonymously with the term "emergency reassignment." (See Tr. 636:22-637:4.) However, it was disputed at trial whether self-swaps were allowed in 2010, when Wharton began submitting time-off requests. (Tr. 882:9-24.)

There was also disagreement at trial about the way requests for "religious accommodation" were supposed to be handled. Ostermann, the Director of Equal Employment Opportunity for Nassau County, testified that employees were required to take vacation or personal time if they wanted to attend a religious observance. (Tr. 509:24-510:10.) However, the Department had a written policy concerning religious accommodations: "[r]equest[s] for employee leave and any other accommodation for religious observance shall be granted, including days off for religious observance, unless doing so would create an undue hardship or an obstruction to the proper operation of governmental function." (Tr. 144:21-145:1.) Zuarro testified that the policy required the Department to have a "good reason" before it could deny Wharton's religious accommodation requests.[5] (Tr. 146:24-147:7.)

---

[5] Loconsolo, the General Counsel of the Sheriff's Department, similarly testified that it was the County's policy to "permit reasonable accommodations that allow an individual to respect his or her religious observances," (Tr. 815:7-10), unless to do

III.  Wharton's Requests for Religious Accommodation

        In April 2010, Wharton submitted an inter-departmental
memo to Captain Dudek requesting "emergency reassignment for
religious accommodation" to take off on April 3 and April 4, 2010.
(Tr. 634:3-5, 634:15-17, 635:18-636:21.)  Wharton claimed that he
tried to use vacation time to take these days off in the beginning
of the year, but the days were not available. (Tr. 639:15-640:4.)
On June 9, 2010, Wharton made another time-off request--he sent a
form to Zuarro, Dudek, and Loconsolo requesting a reassignment for
religious reasons.   (Tr. 650:2-20.)  Dudek denied Wharton's April
and June 2010 requests.  In Dudek's memo denying the requests, he
wrote: "reassignment is generally done in order for employees to
conduct official business relating to their County employment."
(Tr. 654:15-19, 658:3-7.)  Loconsolo testified at trial that she
viewed Wharton's April 2010 request as an effort to take Easter
Sunday off to engage in outside employment, however, Wharton was
not being paid for his religious activities. (Tr. 818:3-6, 818:11-
13, 736:8-14.)

        Wharton submitted two additional requests to take time
off in 2010 for which he did not receive responses.  On May 19,
2010, Wharton asked for time off to attend a meeting with the

─────────────────

so would "cause undue hardship to the operation of the County,"
(815:25-816:1).

Disaster Relief Command of Nassau County, where Wharton served as a chaplain. (Tr. 646:24-647:8.) Wharton described the Disaster Relief Command as "a quasi-type organization which consisted of . . . doctors, lawyers, clergy [and] professionals." (Tr. 647:19-21.) He wrote in his request for reassignment, "I'm a Christian within the Protestant faith and I'm expected to provide religious administration and management in this command." (Tr. 648:13-16.) Nobody responded to Wharton's request and he did not attend the event. (Tr. 650:21-651:5.) Similarly, on June 30, 2010, Wharton submitted another time-off request for religious reasons, (Tr. 670:12, 671:11-12), but he did not receive a response, (Tr. 672:2-3).

Wharton again requested "to be reassigned, self-swap" in order "to participate in [ ] religious services as a clergy person" on October 31, 2010. (Tr. 673:19-25.) He checked the box on the request for "religious accommodation." (Tr. 885:4.) Captain Humphreys, the head of the the human resources department, testified that he "denied the self-swap [request] outright" because he believed self-swaps were not allowed.[6] (Tr. 886:6-7.) Since Captain Humphreys was initially "unsure" how to deal with the religious accommodation request, however, he "had a

---

[6] Captain Humphreys testified that he believed self-swaps did not exist because a Corrections Officer named Ignarro told him that "there were no more self-swaps." (893:20-894:24.)

consultation with the General Counsel" before issuing the denial. (Tr. 886:8-11, 897:15-20.)

Wharton requested time off on March 28, 2011--this time addressing his request to a Nassau County affirmative action specialist. (Tr. 684:13-24.) Wharton specifically asked to take time off on April 17, 22, and 24 for Palm Sunday, Good Friday, and Easter Sunday. (Tr. 686:15-21.) In his written request, Wharton explained that he wanted to take the time off, "due to the fact that I am a Christian (Protestant) certified senior chaplain and a licensed ordained clergy person in my church." (Tr. 686:15-21.) The affirmative action specialist denied Wharton's request and wrote, "I believe that this request does not fall under the EEO policy. According to your work schedule, you have the entire day to attend all ceremonies during these religious holy days. Your hours at work do not interfere with your religious observance." (Tr. 690:6-16.)

Wharton admitted that he did not fill out a time and leave request form in connection with any of his time-off requests. However, he claimed that he was previously granted self-swaps for religious purposes, (Tr. 751:13-18.), and testified that the denial of his April 2010 request was the first time one of his requests to take off for religious reasons was ever denied, (Tr. 637:16-23). When asked how he felt after one of his time-off

requests was denied, he testified, that he "felt betrayed."  (Tr. 642:12-13, 644:9-15.)

IV.  Wharton's Equal Employment Opportunity Complaints

Wharton filed several complaints regarding his treatment by the Department.  (2013 Order at 9.)  He first submitted a complaint in April 2009, three months before the issuance of the NOPA. (Tr. 371:4-6.)  In the complaint, Wharton claimed that "Department supervisors [ ] subjected him to an ongoing campaign of vilification, character assassination, demeaning gossip, rumors and unfounded charges intended to discredit his reputation in the eyes of his peers, intimidate him in his professional and volunteer activities."  (Brewington Decl., Ex. 1, Docket Entry 129-1, at 18.)  Wharton then submitted an April 2009 Complaint to an affirmative action officer named Joseph Volker ("Volker").  Volker sent the complaint to three people: Ostermann who was Volker's boss; Loconsolo, who was General Counsel to the Sheriff's Department; and the Sheriff.  (Tr. 263:20-21.)  Wharton submitted five additional complaints: three equal employment opportunity ("EEO") complaints, two in April 2010 and one in July 2010, (Brewington Decl., Ex. 1 at 21-24); a complaint to the New York State Division of Human Rights on October 8, 2009; and another EEO complaint on September 2, 2009,  (Brewington Decl., Ex. 1 at 26, Tr. 698:7-8).

At trial, Loconsolo and Ostermann both discussed how Wharton's EEO complaints were handled. When an EEO representative received a complaint he would forward it to Ostermann, who would decide whether to conduct an investigation. (Tr. 356:5-13, 424:9-21.) However, not every complaint resulted in a full investigation. Ostermann testified that she sometimes would conduct a "limited inquiry" to determine whether a full investigation was necessary. (Tr. 517:6-518:19.) Wharton's complaints resulted only in a limited inquiry, during which Wharton was interviewed, but no further action was taken. (Tr. 495:19-496:7.)

Loconsolo admitted that Ostermann asked for her assistance with Wharton's Complaints. Loconsolo "had a conversation" with Dudek before he prepared the June 10, 2010 letter to Wharton rejecting one of his time-off requests, (Tr. 811:11-14, 444:16-445:24), and also spoke to Humphreys' before he denied Wharton's October 31, 2010 time-off request, (Tr. 897:15-20). Loconsolo testified that "there was a general direction from the Sheriff to work with the affirmative action officers and the EEO director." (Tr. 810:20-22). She also admitted that she wore more than one hat at the Department and if someone were suing the department, it was her "job to protect the department." (Tr. 809:21-23.)

Wharton opined that his requests for religious accommodation were denied because he "filed a [complaint] with the affirmative action office." (Tr. 698:15-18.) He explained that before filing the April 2009 complaint he had never been reprimanded and never had problems taking days off for religious observances. (Tr. 699:8-23.)

V.   Wharton's Injuries

Wharton presented testimony at trial that the issuance of the NOPA and the Department's denials of time-off requests affected him emotionally. He testified that the Department's treatment made him feel "singled out" and "ostracized"--like he was "not really part of the team." (Tr. 699:24-700:1, 703:3-4, 709:20.) Wharton also claimed that he was concerned about his safety at work after he received the NOPA. (Tr. 708:12-24.)

Wharton's wife of thiry-eight years testified that Wharton's behavior at home changed after he received the NOPA. He "felt betrayed," she said, "[t]he trust from the department that he thought that he had wasn't there." (Tr. 827:1-3.) According to his wife, Wharton's emotional problems manifested themselves physically--he wasn't as "interactive with the family," was less intimate with his wife, developed headaches, and had trouble sleeping. (Tr. 829:15-16, 829:23-830:4.)

To cope with his emotional issues, Wharton sought "pastoral counseling" from his bishop, Roger Clark Seaver, and

from Reverend Algernon Hannah, an associate pastor at his church. (Tr. 717:10-15, 390:7-11.) Hannah testified that he knew Wharton for twenty-five to thirty years and provided religious counseling to him for a decade. (Tr. 395:14-21, 396:12-20.) Hannah testified that between 2007 and 2009 he observed that Wharton became "depressed about what was happening on the job." (Tr. 397:2-12.) Hannah acknowledged, however, that he had no clinical training. (Tr. 397:19-22.) On cross examination, Hannah admitted that Wharton never discussed any physical manifestations of his unhappiness. (Tr. 407:1-408:1.) Hannah also admitted on cross-examination that Wharton's son had been arrested during the time he was feeling depressed at work and that Wharton felt embarrassed because of the incident. (Tr. 405:22-406:6.)

Wharton also claimed that he was damaged professionally. He testified that his "professional relationship with coworkers [and] supervisors" became "tainted" and his "reputation with other clergy, [and] other volunteers" was also damaged. (Tr. 578:7-12.) Wharton also asserted that the NOPA stunted his opportunity to get a master's certification as a chaplain, which he planned to obtain with the support of a religious organization. (Tr. 579:6-11, 703:24-704:4, 729:2-7.) Finally, Wharton testified that he felt the NOPA "affected [his] opportunity for mobility within the department as far as promotions." (Tr. 701:9-12.) However, Wharton admitted that he was not fined, demoted, suspended, or terminated.

(Tr. 748:8-25.)  Moreover, he had to take and pass an exam before he could be promoted from Corrections Officer to Corporal.  (Tr. 748:11-25.)

VI.  Procedural History

After Defendants moved for summary judgment, the Court issued the 2013 Order dismissing all of Wharton's claims except for his claims of: (1) religious discrimination under Title VII, and New York Executive Law § 296; and (2) retaliation pursuant to 42 U.S.C. § 1983, Title VII, and New York Executive Law § 296. (2013 Order at 29-30, 41.)  The Court found that both the July 2009 NOPA and "Defendants' denial of Plaintiff's requests for reassignments, self-swaps, and time off [were] adverse [employment] actions." (2013 Order at 29.)  Following trial, the jury found that Defendants did not discriminate against Wharton, but that Defendants were nevertheless liable for retaliating against him.  (Panico Decl., Docket Entry 127-1, Ex. A.)  They jury awarded Wharton $375,000 in compensatory damages and $45,000 in punitive damages against each individual defendant, totaling $420,000.  Defendants now move for judgment as a matter of law, or in the alternative, for a new trial.

## DISCUSSION

The Court will first address the applicable legal standards before turning to the Defendants' arguments more specifically.

15

I.   <u>Legal Standard</u>

    A.   <u>Judgment as a Matter of Law</u>

        The Court may only grant a motion for judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  F<small>ED</small>. R. C<small>IV</small>. P. 50(a)(1).  "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict."  <u>Cross v. N.Y. City Transit Auth.</u>, 417 F.3d 241, 248 (2d Cir. 2005). Following a full jury trial, "a court may set aside the verdict only 'if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.'"  <u>Cash v. Cnty. of Erie</u>, 654 F.3d 324, 333 (2d Cir. 2011) (quoting <u>Kinneary v. City of N.Y.</u>, 601 F.3d 151, 155 (2d Cir. 2010)).  "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"  <u>Jones v. Town of E. Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012) (quoting <u>Zellner v. Summerlin</u>, 494 F.3d 344, 371 (2d Cir. 2007)).  The Court is also guided by the principle that jurors are

"not required to accept the entirety of either side's account, but [are] free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credited." Haywood v. Koehler, 78 F.3d 101, 105 (2d Cir. 1996).

B. New Trial

Under Rule 59 of the Federal Rules of Civil Procedure "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998) (internal quotation marks and citation omitted). The standard governing a Rule 59 motion for a new trial on the ground that the verdict was against the weight of the evidence differs from the standard governing a Rule 50 motion. "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998). In addition, the trial judge is "free to view the evidence himself, and need not view it in the light most favorable to the [nonmovant]." Song v. Ives Lab., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (internal quotation marks and citation omitted). When considering a motion for a new trial under Rule 59, however, the court should bear in mind that such a motion should be granted only where the jury's verdict was "egregious." Dunlap-McCuller v.

Riese Org., 980 F.2d 153, 158 (2d Cir. 1992).  Thus, a court should rarely disturb a jury's evaluation of a witness' credibility.  Id.

II.  Adverse Employment Action

Defendants first argue that they are entitled to judgment as a matter of law because Wharton did not prove at trial that he was subjected to an adverse employment action.  (Defs.' Br., Docket Entry 127-2, at 6.)  In the 2013 Order, the Court identified two potential adverse employment actions that could form the basis of a retaliation claim: (1) the NOPA Wharton received in April 2009, and (2) the various denials of his time-off requests.  (2013 Order at 19-25.)  Wharton argues that sufficient evidence was presented at trial to establish that both the issuance of the NOPA and the denials of Wharton's time-off requests were adverse employment actions.  (Pl.'s Opp. Br., Docket Entry 130-1, at 5-9.)  The Court agrees.

"The anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S. Ct. 2405, 2414, 165 L. Ed. 2d 345 (2006).  To prove that a particular event was an adverse employment action, a plaintiff must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id.

(internal quotation marks and citation omitted); See also Galabya
v. N.Y. City Bd. of Educ., 202 F.3d at 636, 646 (2d Cir. 2000) (an
adverse employment action "must be more disruptive than a mere
inconvenience or an alteration of job responsibilities" (internal
quotation marks and citation omitted)).

A.    The NOPA

Defendants argue, as they did in their summary judgment
motion, that the NOPA Wharton received was not an adverse action
because it was merely a "counseling notice" that did not affect
the terms or conditions of Wharton's employment.  (Defs.' Br. at
6-7.)  Wharton counters that the NOPA was an adverse employment
action because it was "the first step in the disciplinary process"
and was a "reprimand" that could have "result[ed] in future
difficulties [for Wharton] as an employee."  (Pl.'s Br. at 7.)

A number of cases in this Circuit have addressed whether
a counseling notice can be classified as an adverse employment
action for purposes of a retaliation claim.  In Humphrey v. Cnty.
of Nassau, No. 06-CV-3682, 2009 WL 875534, at *5 (E.D.N.Y. Mar.
30, 2009), Judge Joseph F. Bianco found that that the issuance of
an NOPA could have been an adverse employment action because it
could "negatively affect personal growth" and "form the basis of
further discipline."  Conversely, in Tepperwien v. Entergy Nuclear
Operations, Inc., No. 07-CV-0433, 2010 WL 8938797, at *5 (S.D.N.Y.
Mar. 16, 2010), aff'd, 663 F.3d 556 (2d Cir. 2011), the court

19

decided that a counseling notice was not an adverse employment action because it was expunged from the employee's personal file, and because witnesses "consistently testified" that the notice was not disciplinary in nature. The court therefore classified the document only as a criticism that did not have any lasting impact. Similarly, in Chang v. Safe Horizons, 254 F. App'x 838, 839 (2d Cir. 2007), the Second Circuit explained that an employee cannot suffer an adverse employment action if she is merely given an oral or written warning as part of a progressive disciplinary scheme.

Here, there was sufficient evidence to support the conclusion that the issuance of the NOPA was an adverse employment action. At trial, Zuarro admitted that issuing a NOPA was the "first step in the disciplinary process" and testified that he was unsure whether the Department considered the NOPA when evaluating an employee's performance. Zuarro also testified that a NOPA could only be removed from an employee's personnel file at the employee's request after eighteen months. Wharton testified that, after he received the NOPA, his "professional relationship with coworkers [and] supervisors" became "tainted," and he was concerned about his safety at work. No corrections officers besides Wharton discussed the practical effects of receiving a counseling notice, and the jury was left to weigh Wharton's testimony and credibility against the testimony offered by his supervisors, who maintained that the NOPA was merely a "counseling notice." Whether an action

is materially adverse "depends upon the circumstances of the particular case," and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." <u>White</u>, 548 U.S. at 71, 126 S. Ct. at 2417 (internal quotation marks and citation omitted). Sufficient evidence was presented to lead a reasonable jury to conclude that the NOPA was disciplinary in nature. Therefore, the Court will not disturb the jury's retaliation determination on the grounds that it was not an adverse action. <u>Cash</u>, 654 F.3d at 333 (internal citation and quotation marks omitted)

B.   <u>Denials of Time-Off Requests</u>

Defendants also argue that the denials of Wharton's time-off requests could not have been a basis for the jury's retaliation decision him because "Plaintiff himself did not believe, or could not determine, that the denial[s were] the product of retaliation." (Defs.' Br. at 6.)  The Court already ruled in its 2013 Order that the denial of Wharton's time-off requests could be classified as adverse employment actions because they had the potential to "dissuade a reasonable employee from making or supporting a charge of discrimination." (2013 Order at 29-30.)  On direct examination, Wharton testified that he believed his time-off requests were denied "because [he] filed with the affirmative action office . . . a complaint and that was a form of retaliation." (Tr. 698:15-18.)  He also testified that his

requests for religious accommodation had been granted in the past and the denial of his April 2010 request was the first time one was ever denied. (Tr. 637:16-23.) Although defense witnesses testified that asking for a "self-swap" was not an appropriate way to request time off, it was within the jury's purview to weigh that testimony against Wharton's conflicting account. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (explaining that "the court must give deference to all credibility determinations and reasonable inferences of the jury [ ] and it may not itself weigh the credibility of witnesses or consider the weight of the evidence"); O'Neill v. City of Bridgeport Police Dep't, 719 F. Supp. 2d 219, 229 (D. Conn. 2010) (holding that denial of requests for reassignment, among other actions, could "rise to the level of adverse employment actions in the context of a retaliation claim"). Therefore, it was not unreasonable for the jury to conclude that denying Wharton's time-off requests constituted adverse employment actions.

III. Causal Connection

Defendants contend that Wharton failed to establish a causal connection between his protected activities—-the filing of his complaints regarding discrimination--and the adverse employment actions he suffered--receiving the NOPA and the denials of his time-off request. (Defs.' Br. at 8-9.) Specifically, Defendants claim that no direct evidence of causation exists

because the supervisors who issued the NOPA and denied his time-off requests testified that they did not know of Wharton's complaints. (Defs.' Br. at 8.) "In this Circuit, a [p]laintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'" Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) (second alteration in original) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," id., however, courts "typically measured that gap as a matter of months, not years." Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 131 (2d Cir. 2014); See, e.g., Hubbard v. Total Commc'ns., Inc., 347 F. App'x. 679 (2d Cir. 2009) (holding that the jury was entitled to find a causal connection between an email message and the plaintiff's termination four months later). Wharton engaged in his first protected activity by filing an EEO complaint on April 8, 2009. The NOPA was then issued three months and twelve days later. Wharton filed another EEO complaint on August 7, 2009 and a complaint with the NYSDHR on October 8, 2009--but Wharton's first

time-off request wasn't denied until about six months later on April 1, 2010. In addition, Wharton's April 23, 2010 complaint was followed by the denial of a time-off request on June 10, 2009, less than three months later; his July 21, 2010 complaint was followed by the denial of a time-off request on October 28, 2010, three months and seven days later; and his November 17, 2010 complaint was followed by the denial of a time-off request on March 31, 2011, four months and fourteen days later. Although this timeline only constitutes circumstantial evidence of a connection between the adverse employment actions and his complaints, it cannot be argued that the jury's causation finding lacked an evidentiary basis. Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (finding that "the passage of only six months between the dismissal of [a] lawsuit and an allegedly retaliatory beating by officers. . . [was] sufficient to support an inference of a causal connection"); see Gorman-Bakos, 252 F.3d at 555 (suggesting the lapse of five months between protected activity and retaliation may show a causal connection).

Defendants further argue that they presented legitimate nondiscriminatory reasons for both the issuance of the NOPA and the denials of all of Wharton's time-off requests. Defendants claim that the NOPA was issued because Wharton "violated the Department's Rules and Regulations" and his time-off requests were denied because Wharton "failed to comply with the Department's

time and leave policy." (Defs.' Reply Br., Docket Entry 131, at
7.) However, additional circumstantial evidence presented at
trial undercut that conclusion. Specifically, it came to light
that both Captains Dudek and Humphreys spoke to Loconsolo--who
knew about Wharton's complaints--before denying two of his time-
off requests. Moreover, there was conflicting testimony about
whether self-swaps were allowed by the Department, and under what
circumstances a request for a "religious accommodation" should
have been granted pursuant to the Department's written policies.
This evidence casts doubt on the nondiscriminatory reasons offered
for the issuance of the NOPA and the denials of time-off requests.
It was therefore permissible for the jury to find that Defendants'
stated non-discriminatory reasons for each adverse employment
action was pretextual. Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000);
McGrory v. City of N.Y., No. 99-CV-4062, 2004 WL 2290898, at *8
(S.D.N.Y. Oct. 8, 2004) (holding that the jury was "entitled,
however, to make credibility determinations," and was free to
reject Defendants nondiscriminatory reasons for their actions
based on evidence of pretext).

IV. Monell Liability

The County contends that Wharton did not present
sufficient evidence to establish municipal liability under 42
U.S.C. § 1983. Under Monell v. Department of Social Services, 436

25

U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a plaintiff suing a municipality under Sections 1981 or 1983 must show that the claimed violation of his constitutional rights was the result of a municipal policy or custom.  Carmody v. Vill. of Rockville Centre, 661 F. Supp. 2d 299, 330 (E.D.N.Y. 2009).  Although "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability," a plaintiff can prevail if he shows that the alleged wrongdoing was "widespread and persistent" and that supervisors were aware of it.  Jones, 691 F.3d 72 at 81.  One way of showing the existence of a custom or policy is by establishing that policymakers acquiesced in unconstitutional behavior.  See Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 439-40 (2d Cir. 2009); Carbajal v. Cnty. of Nassau, 271 F. Supp. 2d 415, 422 (E.D.N.Y. 2003) (noting that a plaintiff may prove municipal liability by showing that a policymaker directly committed or commanded the unconstitutional behavior).  Here, Defendants do not dispute that Captains Zuarro, Humphreys, and Dudek, along with Loconsolo, and Ostermann were "policymakers" for purposes of Monell liability.  In addition, it is undisputed that Captains Zuarro, Humphreys, and Dudek repeatedly denied Wharton's time-off requests, which were presented as requests for "religious accommodation."  Moreover, there was evidence that his requests

26

were denied in retaliation for complaining about discimrination. Thus, there was sufficient evidence of a pattern of retaliatory conduct to support the jury's municipal liability finding.

VII. <u>Excessive Damages</u>

At trial the jury awarded the Plaintiff $420,000, consisting of $375,000 in compensatory damages based upon his retaliation claim and $45,000 in punitive damages. (Panico Decl. Ex. A.) The Court agrees.

A jury's award of damages "may not be overturned unless it is so excessive that it shocks the conscience of the court." <u>McGrory v. City of N.Y.</u>, No. 99-CV-4062, 2004 WL 2290898, at *13 (S.D.N.Y. Oct. 8, 2004). If the court decides that a jury's damages award is excessive, "it may do one of three things: (1) order a new trial; (2) order a new trial limited to damages; or, (3) pursuant to the practice of remittitur, condition the denial of a motion for a new trial on the plaintiff's acceptance of a reduced amount of damages." <u>Olsen v. Cnty. of Nassau</u>, 615 F. Supp. 2d 35, 39-40 (E.D.N.Y. 2009). To determine "whether a jury's award is excessive, courts take into account awards rendered in similar cases, 'bearing in mind that any given judgment depends on a unique set of facts and circumstances.'" <u>Id.</u> at 45 (quoting <u>Scala v. Moore McCormack Lines</u>, 985 F.2d 680, 684 (2d Cir. 1993)).

A.  Compensatory Damages

Wharton, his wife, and his minister all testified at length about the emotional distress Wharton suffered as a result of Defendants retaliatory conduct.  "To obtain emotional distress damages, a plaintiff must establish actual injury and the award must be 'supported by competent evidence' in addition to a plaintiff's subjective testimony." Olsen v. Cnty. of Nassau, 615 F. Supp. 2d 35 at 46 (quoting Quinby v. WestLB AG, No. 04-CV-7406, 2008 WL 3826695, at *3 (S.D.N.Y. Aug. 15, 2008).  "In the employment discrimination context, there . . . [is] a 'spectrum' or 'continuum' of damage awards for emotional distress" ranging from 'garden-variety' [to] 'significant' [to] 'egregious' . . . claims." Rainone v. Potter, 388 F. Supp. 2d 120, 121-24 (E.D.N.Y. 2005) (citation omitted).  As Judge Spatt explained in Rainone v. Potter:

> At the low end of the continuum are what have become known as "garden-variety" distress claims in which district courts have awarded damages for emotional distress ranging from $5,000 to $35,000. "Garden-variety" remitted awards have typically been rendered in cases where the evidence of harm was presented primarily through the testimony of the plaintiff, who describes his or her distress in vague or conclusory terms and fails to describe the severity or consequences of the injury. . . .
>
> The middle of the spectrum consists of "significant" ($50,000 up to $100,000) and "substantial" emotional distress claims ($100,000). These claims differ from the

> garden-variety claims in that they are based
> on more substantial harm or more offensive
> conduct, are sometimes supported by medical
> testimony or evidence, evidence of treatment
> by a healthcare professional and/or
> medication, and testimony from other,
> corroborating witnesses.
>
> Finally, on the high end of the spectrum are
> "egregious" emotional distress claims, where
> the courts have upheld or remitted awards for
> distress to a sum in excess of $100,000. These
> awards have only been warranted where the
> discriminatory conduct was outrageous and
> shocking or where the physical health of
> plaintiff was significantly affected.

Id. at 122-23. More recently, Courts have sanctioned jury damages ranging from $30,000 to $125,000 for "garden-variety" emotional distress. See Olsen v. Cnty. of Nassau, 615 F. Supp. 2d at 46, n.4 (collecting cases); Watson v. E.S. Sutton, Inc., No. 02-CV-2739, 2005 WL 2170659, at *16 (S.D.N.Y. Sept. 6, 2005) aff'd, 225 F. App'x 3 (2d Cir. 2006) ("The range of acceptable damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000.")

Here, Wharton was not demoted, fined, or terminated as a result of any of Defendants' actions. Although he claimed that the NOPA affected his promotion opportunities, he admitted that he did not pass the exam necessary to be promoted from corrections officer to corporal. Thus, his only compensable damages were for emotional distress. The evidence is clear, however, that Wharton's

emotional distress did not rise above the garden-variety. Wharton and his wife testified that Defendants actions caused him to feel "ostracized," "betrayed" and concerned about his safety. Wharton's wife also testified that he "wasn't as interactive with the family," was less intimate, developed headaches, and had trouble sleeping. Reverend Hannah, who provided Wharton with "spiritual counseling," also testified that Wharton became "depressed," however, Hannah acknowledged that he had no clinical training, and admitted that Wharton never discussed physical manifestations of his unhappiness. Wharton never sought medical attention for emotional distress and did not introduce testimony from a medical professional. The evidence in this case therefore does not support the $375,000 in compensatory damages awarded by the jury, a verdict above and beyond damages awards in cases where plaintiffs suffered "significant" or "egregious" emotional distress. See, e.g., Sulkowska v. City of N.Y., 129 F. Supp. 2d 274, 305–09 (S.D.N.Y. 2001) (upholding a $275,000 emotional distress award where briefly-incarcerated plaintiff developed post-traumatic stress disorder, was in constant fear, and developed neuroses that required her to check doors, windows, closets, and under the bed each night, and was found to be permanently injured); Thorsen v. Cnty. of Nassau, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010) (In "significant" or "egregious" cases, where there is typically evidence of "debilitating and permanent

alterations in lifestyle," larger damage awards may be warranted.)
This case falls more in line with <u>MacMillan v. Millennium Broadway</u>
<u>Hotel</u>, 873 F. Supp. 2d 546, 554, 562 (S.D.N.Y. 2012), in which the
court reduced a compensatory damages award from $125,000 to $30,000
where the plaintiff and his daughter testified that he "was always
sad," "wasn't his same self," but there was no evidence of a
physical manifestation of plaintiff's distress.  Similarly, in
<u>Campbell v. Cellco P'ship.</u>, No. 10-CV-9168, 2012 WL 3240223, at *4
(S.D.N.Y. Aug. 6, 2012), the court reduced an emotional distress
award from $200,000 to $125,000 for a retaliation claim where the
plaintiff testified that he "felt financially strained, had
difficulty sleeping, was unnerved, and suffered a loss of dignity."
Accordingly, Defendants' motion for a new trial concerning
compensatory damages will be granted unless Wharton agrees to a
remitter reducing the compensatory damages award to $60,000.

    B.   <u>Punitive Damages Awards Against Ostermann and Loconsolo</u>

       In addition to the compensatory damages award, the jury
also awarded punitive damages against each of the five individual
defendants in this case.  Defendants do not argue the
reasonableness of the punitive damages award.  Instead, they argue
that it was improper to grant punitive damages against defendants
Ostermann and Loconsolo because Ostermann and Loconsolo were not
personally involved in any of the adverse employment actions that
occurred here.  In this Circuit, the "personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977), cert. denied, 434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978). Here, Loconsolo and Ostermann were responsible for investigating the discrimination complaints that Wharton claimed caused the retaliatory conduct at issue. In addition, it came to light that both Captains Dudek and Humphreys spoke to Loconsolo before denying two of his time-off requests. Thus, there was circumstantial evidence that Loconsolo was personally involved in the denial of Wharton's time-off requests. Ostermann's involvement, however, was limited solely to investigating Wharton's complaints. Although Ostermann admitted that she only conducted a limited investigation of each complaint, the thoroughness of her investigation was not at issue in this case. Therefore, the jury's determination that she was liable for retaliation could only have been the result of sheer surmise and conjecture. See Smith v. Schweiloch, No. 12-CV-3253, 2012 WL 2277687, at *2 (S.D.N.Y. June 18, 2012) (finding that "[c]onclusory allegations that a prosecutor acted in an investigative fashion by directing allegedly unconstitutional police conduct are insufficient to state a claim.") Therefore, Defendants' motion for judgment as a

matter of law is GRANTED solely with respect to defendant Ostermann and the $15,000 punitive damages award against her is VACATED.[7]

CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law, or in the alternative, for a new trial, is GRANTED IN PART and DENIED IN PART. Specifically, Defendants' motion for judgment as a matter of law is GRANTED solely with respect to defendant Ostermann, and the jury's $15,000 punitive damages award issued against her is VACATED. In addition, Defendants' motion for a new trial concerning compensatory damages will be granted unless Wharton agrees to a remitter reducing the compensatory damages award to $60,000. Wharton is therefore directed to inform the Court within thirty (30) days of the date of this Memorandum & Order whether he will consent to a remitter of the total damages award (including the uncontested $30,000 punitive damages award) from $420,000 to $90,000.


SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   July   30  , 2015
         Central Islip, New York

---

[7] Since Defendants did not argue that the punitive damages award issued by the jury was unreasonable, the Court expresses no opinion on the matter.